**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| J. R., a minor, by and through his mother, Mary Perez, | Nos. 25-334 & 25-5247 |
| *Plaintiff - Appellee*, | D.C. No. 2:22-cv-02717-HDV-MAR |
| v. | |
| VENTURA UNIFIED SCHOOL DISTRICT, | OPINION |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the Central District of California
Hernan Diego Vera, District Judge, Presiding

Argued and Submitted October 6, 2025
San Francisco, California

Filed April 22, 2026

Before: Jacqueline H. Nguyen and Daniel A. Bress, Circuit
Judges, and Richard D. Bennett, District Judge.[*]

Opinion by Judge Bress

---

[*] The Honorable Richard D. Bennett, United States District Judge for the
District of Maryland, sitting by designation.

# SUMMARY**

## Individuals with Disabilities Education Act

Reversing the district court's judgment, the panel held that a lawsuit brought by parents against the Ventura Unified School District under the Individuals with Disabilities Education Act (IDEA) was untimely as to educational services their child received before 2019.

As a preliminary matter, the panel held that the district court's judgment—which fully resolved the merits and left only the question of attorneys' fees pending—was final and appealable for purposes of 28 U.S.C. § 1291.

The parents challenged the school district's alleged failure to assess their child for autism. They did not sue until the child was diagnosed with autism in 2021, but they sought relief from the school district for allegedly inadequate education going back to 2012.

The panel held that the parents' IDEA suit was untimely as to educational services received prior to 2019. The IDEA requires that parents must challenge their child's allegedly inadequate special education within two years of the date the parents "knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C). This statute of limitations sets forth a discovery rule, providing that actual or constructive knowledge is sufficient to start the limitations period. The panel held that for an IDEA claim alleging that a school

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district's failure to assess and diagnose a student has resulted in the alleged denial of a free appropriate public education (FAPE), the statute of limitations begins to run when parents know or should know (1) the fact of the school district's action or inaction (*i.e.*, the failure to assess and diagnose), and (2) that their child is being denied a FAPE (*i.e.*, the child's education is inadequate). Here, because the parents knew the school district had not assessed their child for autism and had sufficient reason to believe his education was chronically inadequate, their claims predating the limitations period were time-barred.

Adopting the Third Circuit's analysis, the panel found inapplicable an exception to the two-year limitations period based on misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint. The panel also found inapplicable an exception based on withholding of required information from a parent.

Accordingly, the panel reversed the district court's judgment awarding benefits for the 2012-2019 period, vacated the district court's remedial order establishing an educational trust and its order granting a motion to enforce the judgment, and remanded for any further proceedings as to attorneys' fees.

## COUNSEL

Andréa M. Marcus (argued), Law Office of Andréa Marcus, Montecito, California, for Plaintiff-Appellee.

Molly E. Thurmond (argued) and Melissa Hatch, Hatch & Cesario, Ventura, California, for Defendant-Appellant.

Jennifer Nix and Olivia P. Brown, Fagen Friedman & Fulfrost LLP, Oakland, California; Kristin Lindgren-Bruzzone, Bode Owoyele, and Dana Scott, California School Boards Association's Education Legal Alliance, West Sacramento, California; for Amicus Curiae California School Boards Association's Education Legal Alliance.

Selene A. Almazan-Altobelli, Council of Parent Attorneys and Advocates Inc., Towson, Maryland; Catherine M. Reisman, Reisman Gran Zuba LLP, Cherry Hill, New Jersey; for Amici Curiae Council of Parent Attorneys and Advocates Inc., The California Association for Parent-Child Advocacy, and Disability Rights Education and Defense Fund.

**OPINION**

BRESS, Circuit Judge:

We consider the timeliness of a lawsuit under the Individuals with Disabilities Education Act (IDEA). The IDEA requires that parents must challenge their child's allegedly inadequate special education within two years of the date the parents "knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C). In this case, the parents challenge the school district's alleged failure to assess their child for autism. The parents did not sue until their son was diagnosed with autism in 2021, but they sought relief from the school district for allegedly inadequate education going back to 2012—the entire tenure of the student's time in the school district.

We hold that the parents' IDEA suit is untimely as to educational services received prior to 2019. Because the parents knew the school district had not assessed their child for autism and had sufficient reason to believe his education was chronically inadequate, the claims predating the limitations period are time-barred. A later clinical diagnosis may confirm the problem, but it does not automatically restart the IDEA's clock. We reverse the contrary judgment of the district court.

I

A

The IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education," or "FAPE." 20 U.S.C. § 1400(d)(1)(A); *see Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-*

*1*, 580 U.S. 386, 390–91 (2017). In return for federal funding, school districts must provide students with disabilities a FAPE that meets various standards and their unique needs. *See A.J.T. v. Osseo Area Schs., Indep. Sch. Dist.*, 605 U.S. 335, 339–40 (2025); *L.A. Unified Sch. Dist. v. A.O.*, 92 F.4th 1159, 1165 (9th Cir. 2024). To that end, the IDEA requires that school districts "conduct a full and individual initial evaluation" that assesses children in "all areas of suspected disability," using "a variety of . . . technically sound instruments." 20 U.S.C. § 1414(a)(1), (b)(2)–(3). A disability is "'suspected,' and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016).

Once a child is determined to have a disability, a team that includes a local educational agency representative, teachers, and the child's parents formulates an individualized education plan (IEP). 20 U.S.C. § 1414(d)(1)(B); *Endrew F.*, 580 U.S. at 391; *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007). As a "comprehensive plan" for the child's education prepared based on collaboration between teachers, school officials, and parents, *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 910 (9th Cir. 2020), the IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). Among other things, "the IEP must describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining the annual goals.'" *McIntyre*, 976 F.3d at 910 (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(IV)). The school district must reevaluate the child at least once every three

years, unless the parent agrees that a reevaluation is unnecessary. 20 U.S.C. § 1414(a)(2)(B)(ii).

The IDEA allows parents to challenge a school district's provision of special education. Parents can file due process complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6)(A). This complaint "triggers a preliminary meeting between the parents and the IEP team," and "[i]f the complaint is not resolved to the parents' satisfaction, the parents have a right to a 'due process hearing' before an administrative law judge." *L.B. v. S.D. Unified Sch. Dist.*, 168 F.4th 1150, 1155 (9th Cir. 2026) (citing 20 U.S.C. § 1415(e), (f)(1)(B)(i), then quoting *id.* § 1415(f)(1)(A)). If a party aggrieved disagrees with the administrative findings and decision, the IDEA allows for judicial review in state and federal court. 20 U.S.C. § 1415(i)(2)(A); *see Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1054 (9th Cir. 2012).

In 2004, Congress amended the IDEA to add a statute of limitations. *See Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 940 (9th Cir. 2017); *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608–09 (3d Cir. 2015). Section 1415(f)(3)(C) now provides:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a

> hearing under this subchapter, in such time as the State law allows.

California has adopted this same two-year statute of limitations. *See* Cal. Educ. Code § 56505(*l*). In addition, Congress specified two exceptions to the limitations period. The two-year statute of limitations in § 1415(f)(3)(C) has two exceptions. Specifically, the "timeline" in § 1415(f)(3)(C)

> shall not apply to a parent if the parent was prevented from requesting the hearing due to (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(D). Once the administrative law judge issues a decision, an aggrieved party has 90 days to file suit in state or federal court. *Id.* § 1415(i)(2)(B).

## B

From 2012 to 2021, J.R. was a student at Ventura Unified School District (VUSD) in Ventura, California. In 2012, when J.R. was six years old and in kindergarten, VUSD conducted an initial psychoeducational assessment of him, with his parents' consent. VUSD school psychologist Roxana Llano administered the assessment and documented "clinically significant" behavior ratings in hyperactivity, attention, and atypicality; poor auditory processing; and lower-extreme to below-average academic ranges. Llano

also noted teachers' concerns about J.R.'s ability to stay on task, his maturity, and his ability to follow directions.

Based on the 2012 assessment, VUSD concluded that J.R. had a "specific learning disability"—a statutory category that "means a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written." *Id.* § 1401(30)(A). VUSD did not assess J.R. for autism or discuss it as a possibility with J.R.'s parents.

Between 2013 and 2015, J.R. continued to exhibit significant behavioral and social deficits. Teachers reported that he struggled to follow directions, yelled, and frequently blurted out inappropriate sounds or comments. Starting in second grade, J.R. began receiving special education for all subjects in a classroom designed for students with mild to moderate learning disabilities. In 2015, VUSD school psychologist Katherine Beley conducted J.R.'s triennial assessment and concluded that J.R.'s cognitive functioning was "very low for most types of tasks." While Beley noted that J.R.'s behavior had improved since the prior year, his "atypicality" rating remained "clinically significant." VUSD again did not assess J.R. for autism.

By 2018, J.R. still was not progressing. While school psychologist Jana Woodruff's 2018 assessment showed that J.R.'s behavioral scores had improved into the "Average" range, most of his academic skills were "Well Below Average," with language skills in the first percentile or lower. Now in sixth grade, J.R. was still reading at a kindergarten level. As reflected in the assessment, J.R.'s mother expressed concern that J.R. was "not learning or advancing." The 2018 assessment was also the first to specifically mention autism as a possibility, but Woodruff

concluded that "[b]ased on parent reports, school records, observations and current testing," J.R. "does not appear to meet eligibility criteria for Autism."

In 2018, J.R.'s parents sought an evaluation from a private psychologist, Dr. Nick Barneclo. Barneclo, like VUSD, diagnosed J.R. with a specific learning disability. Barneclo did not mention autism as a possibility. J.R.'s parents then requested that VUSD provide J.R. with additional individualized instruction from a reading specialist, but VUSD denied their request because J.R. was already receiving special education in every subject, including reading. In response, J.R.'s mother expressed frustration that J.R. "has not made progress since the 1st grade." She informed VUSD that she would seek legal assistance and was considering filing a lawsuit against VUSD. But no lawsuit materialized.

In February 2021, when J.R. was in ninth grade, VUSD school psychologist Kaylee Peterson conducted J.R.'s fourth triennial assessment. J.R. continued to score in the first percentile or below in most areas, and some of his behavioral scores were now in the "Clinically Significant" range. In the meeting to discuss VUSD's 2021 assessment, J.R.'s mother asked if VUSD had "ever thought about assessing him for autism." Peterson told J.R.'s mother that "[t]here wasn't anything within the current assessment that . . . indicated that we need to look at autism."

J.R.'s mother did not sign off on J.R.'s 2021 IEP. Instead, she retained clinical psychologist Dr. B.J. Freeman to conduct another independent assessment of J.R. Freeman conducted additional tests, reviewed J.R.'s VUSD file, interviewed J.R.'s mother and teachers, and observed him at

school.  In June 2021, Freeman diagnosed J.R. with autism.
By October 2021, J.R. had moved to Texas.

C

J.R., through his parents, filed a due process complaint
against VUSD on April 8, 2021, through California's Office
of Administrative Hearings (OAH).    J.R.'s complaint
primarily alleged that VUSD had failed to assess him for
autism beginning in 2012.  An Administrative Law Judge
(ALJ) held a fourteen-day hearing in the fall of 2021.
Various witnesses testified, including J.R.'s mother, all four
VUSD psychologists who had assessed J.R., and plaintiff's
expert, Freeman, who had recently diagnosed J.R. with
autism.

On January 24, 2022, the ALJ issued a 97-page decision.
The ALJ first found that the IDEA's two-year statute of
limitations barred J.R.'s claims predating April 8, 2019.  The
ALJ reasoned that VUSD's assessments of J.R. and the IEP
meetings from 2012 to 2019 put J.R.'s parents "on notice of
the very behaviors which [J.R.] argued were indicative of
autism."  And because VUSD informed J.R.'s parents about
all the assessments it conducted, J.R.'s parents should have
known that VUSD had not assessed for autism.  The ALJ
thus concluded that prior to 2019, J.R.'s parents "knew or
should have known about the alleged action that forms the
basis of the complaint."  20 U.S.C. § 1415(f)(3)(C).  And
because neither of the exceptions to the statute of limitations
applied, *see id.* § 1415(f)(3)(D), claims predating April 8,
2019 were untimely.

As to the period after April 8, 2019, which was not time-
barred, the ALJ found that VUSD failed to provide J.R. with
a FAPE because VUSD did not assess J.R. for autism.  The
ALJ ordered VUSD to furnish J.R. $19,000 for 152 hours of

compensatory education and to reimburse J.R.'s parents for two independent evaluations they had commissioned.

On April 23, 2022, J.R., through his mother, filed a complaint against VUSD in federal court seeking review of the ALJ's decision as it concerned educational services received prior to April 8, 2019. The parties stipulated to having the case decided on the papers. In a December 21, 2023 decision, the district court ruled in J.R.'s favor, rejecting the ALJ's statute of limitations determination and finding that VUSD had denied J.R. a FAPE since 2012. The district court issued its decision as a published opinion. *See J.R. v. Ventura Unified Sch. Dist.*, 668 F. Supp. 3d 1054 (C.D. Cal. 2023).

In the district court's view, J.R.'s pre-2019 claims were timely because his parents could not have known the basis of their claims until J.R. was diagnosed with autism in 2021. *Id.* at 1070–73. The court emphasized that J.R.'s parents had "earnestly adhered to the district's purportedly expert guidance" and lacked the "specialized skill to contest J.R.'s diagnosis." *Id.* at 1071. Even though J.R.'s parents knew that VUSD had not assessed J.R. for autism, they did not know that VUSD should have assessed him for autism until he was actually diagnosed with it in 2021. *Id.* at 1072–73.

According to the district court, "[a]bsent an understanding that J.R.'s symptoms were symptoms *of autism*, Parents did not have any reason to disagree with Ventura." *Id.* at 1071 (emphasis in original). In other words, "in order for J.R.'s inadequate education to serve as notice, Parents needed knowledge of the action (*i.e.*, VUSD did not test for autism) *and* knowledge that the action caused harm (*i.e.*, J.R. suffered from undiagnosed autism)." *Id.* at 1072–73 (emphasis in original). The court also found that even if

the claims were otherwise barred under the two-year limitations period, both statutory exceptions applied because VUSD "recklessly misrepresented J.R.'s assessment results" and "withheld information" that prevented J.R.'s parents from understanding that VUSD had improperly diagnosed him. *Id.* at 1073–74.

Having found the pre-2019 claims timely, the district court next determined that VUSD's failure to assess J.R. for autism beginning in 2012 denied him a FAPE, noting that J.R.'s pre-2019 symptoms were virtually identical to the post-2019 symptoms that the ALJ had found actionable. *Id.* at 1075–77. Approximately a year later, and after further proceedings, the district court in December 2024 issued a further order on the remedy, directing that VUSD pay $510,960 into a special needs trust to fund compensatory education for J.R., who by this point had moved to Texas. The court specified that the trust would fund certain educational services, such as reading and speech instruction.

VUSD appealed the district court's decision to this court. Subsequently, on July 30, 2025, the district court granted J.R.'s motion to enforce the court's judgment and directed VUSD to fund the charitable trust by August 28, 2025. VUSD separately appealed this post-judgment order. After we heard oral argument, we granted VUSD's motion to stay enforcement of the district court's July 30, 2025 post-judgment order to fund the charitable trust, pending our resolution of these appeals.

## II

Before turning to the statute of limitations question, we first address whether we have appellate jurisdiction. Although the district court ruled for J.R. on the merits, it has not yet resolved his motion for attorneys' fees, which seeks

fees for work performed during both the ALJ and district court proceedings. This included fees for successfully prevailing before the ALJ on his post-2019 claims, a fee request that was the subject of a stand-alone cause of action in J.R.'s district court complaint.

The parties stipulated to stay proceedings on the fee motion pending the outcome of this appeal, raising the question of whether the judgment is final despite the unresolved fee request. *See* 28 U.S.C. § 1291. The parties agree we have jurisdiction. But we must independently assess the issue for ourselves. *See, e.g.*, *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1092 (9th Cir. 2007). We conclude that the district court's decision is final under § 1291 and that we have jurisdiction.

In *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988), the Supreme Court adopted the "bright-line rule" that "a decision on the merits is a 'final decision' for purposes of § 1291 whether or not there remains for adjudication a request for attorney's fees attributable to the case." *Id.* at 202–03. Subsequent developments solidified that rule. In 1993, the Federal Rules of Civil Procedure were amended to provide that, unless the district court extends the time to appeal, a motion for attorneys' fees will not delay the time for filing a notice of appeal. *See* Fed. R. Civ. P. 58(e); Fed. R. App. P. 4(a)(1)(A), (a)(4)(A)(iii); *Nutrition Distrib. LLC v. IronMag Labs, LLC*, 978 F.3d 1068, 1076 (9th Cir. 2020) (explaining the 1993 amendments "codif[ied] *Budinich*'s bright-line rule"). Then, in *Ray Haluch Gravel Co. v. Central Pension Fund*, 571 U.S. 177 (2014), the Supreme Court clarified that *Budinich* applies to fee requests based on contractual fee-shifting provisions, including fees attributable to "preliminary steps toward litigation." *Id.* at 189–90.

These authorities would confirm our jurisdiction notwithstanding J.R.'s unresolved fee motion, were it not for a footnote in an earlier decision of ours, *Hacienda La Puente Unified Sch. Dist. of Los Angeles v. Honig*, 976 F.2d 487, 490 n.2 (9th Cir. 1992). In *Hacienda*, an IDEA case decided after *Budinich* but before the 1993 rule amendments and *Ray Haluch*, the student prevailed before a state hearing officer and then, after the school district sought review of the ALJ's decision, the student filed a counterclaim in district court seeking only the fees incurred during the administrative proceedings. *Id.* at 489–90. The district court rejected the school district's challenge and awarded fees associated with the administrative proceedings to the student. *Id.* at 490. In a footnote, we addressed when the district court's decision became final. *Id.* at 490 n.2. We said that because the student's fee claim "did not involve fees pertaining to the district court litigation, the rule separating for purposes of finality a decision on the merits from a decision on attorney's fees 'for the litigation at hand' [was] not applicable," such that no final judgment existed until the district court resolved the fee counterclaim. *Id.* at 490 n.2 (quoting *Budinich*, 486 U.S. at 201).

*Hacienda* predates the Supreme Court's clarification in *Ray Haluch* that *Budinich*'s bright-line rule applies even to fees "accrued before the complaint was filed," including those attributable to "preliminary steps towards litigation" and those "incurred prior to the commencement of litigation." 571 U.S. at 189–90. By confirming that pre-litigation fees are "for the litigation at hand," *Budinich*, 486 U.S. at 201, *Ray Haluch* may undercut the logic of *Hacienda*'s footnote two.

Regardless, *Hacienda* does not govern here. *Hacienda* specifically distinguished the situation before it from one

"involv[ing] fees pertaining to the district court litigation." *Hacienda*, 976 F.2d at 490 n.2. Here, J.R. seeks fees for both the ALJ proceedings and the district court litigation. So this case falls outside the scope of *Hacienda*'s footnote two, and is governed by *Budinich*. The district court's judgment—which fully resolved the merits and left only the fee question pending—is final for purposes of 28 U.S.C. § 1291.

### III

We now turn to the question that divided the ALJ and district court: whether the IDEA's statute of limitations bars J.R.'s pre-2019 claims. We review "de novo the district court's conclusions of law, including the question whether a claim is barred by a statute of limitations." *Avila*, 852 F.3d at 939. We conclude that J.R.'s pre-2019 claims are untimely.

### A

As set forth above, the IDEA requires parents to request a due process hearing "within 2 years of the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C). We held in *Avila* that this provision creates a discovery rule, "meaning that the statute of limitations is triggered when 'a plaintiff discovers, or reasonably could have discovered, his claim.'" *Avila*, 852 F.3d at 940 (quoting *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147 (9th Cir. 2002)). Section 1415(f)(3)(C)'s "knew or should have known" language confirms that actual or constructive knowledge is sufficient to start the limitations period. As the Supreme Court has explained, a discovery rule "allow[s] a claim to accrue when the litigant first knows *or with due diligence should know* facts that will form the basis for an action." *Merck & Co. v. Reynolds*, 559 U.S. 633,

646 (2010) (quotation omitted); *see also O'Connor*, 311 F.3d at 1147 (discussing the reasonable diligence requirement). At the same time, "mere suspicion of the elements of a claim" is not enough, as a general matter, to qualify as constructive knowledge. *O'Connor*, 311 F.3d at 1148.

We have not had occasion since *Avila* to explore the IDEA's statute of limitations in any meaningful depth. But we must do so to consider the argument, which the district court adopted, that the limitations period did not begin to run until J.R. was diagnosed with autism in 2021. We will explain shortly why J.R.'s position is untenable. But we begin with what we believe is the proper interpretation of the statutory text and related precedent.

Under 20 U.S.C. § 1415(f)(3)(C), the IDEA's statute of limitations begins to run when parents have knowledge (actual or constructive) of "the alleged action that forms the basis of the complaint." In a suit brought by parents, the "alleged action" is whatever the school district has done or failed to do under the IDEA. Here, by J.R.'s allegations, it is the school district's failure to assess J.R. for autism. And the "basis of the complaint" is the alleged denial of the free appropriate public education, or FAPE, to which the IDEA entitles qualifying students.

Section 1415(f)(3)(C) thus reflects the statutory scheme as whole, which focuses on whether the school district's actions resulted in the denial of a FAPE. The IDEA specifically instructs ALJs who hear these challenges in the first instance that, except in matters alleging a procedural violation, "a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public

education." 20 U.S.C. § 1415(f)(3)(E)(i). And for procedural violations, the hearing officer must consider whether the child "did not receive a free appropriate public education," which is true only if the procedural inadequacies "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." *Id.* § 1415(f)(3)(E)(ii). Once again, the denial of a FAPE is the central throughline.

Putting the pieces together, we hold that for an IDEA claim alleging that a school district's failure to assess and diagnose a student has resulted in the alleged denial of a FAPE, the statute of limitations begins to run when parents know or should know (1) the fact of the school district's action or inaction (*i.e.*, the failure to assess and diagnose), and (2) that their child is being denied a FAPE (*i.e.*, the child's education is inadequate). The second requirement is essential, for mere awareness (actual or constructive) that a school district has not diagnosed a student for a particular disability is of little moment if the education is otherwise meeting the student's needs, or if the parents do not know or have reason to know otherwise.

Our interpretation of the IDEA's statute of limitations for failure-to-assess claims follows from our decision in *Avila*. There, after concluding that § 1415(f)(3)(C) creates a discovery rule, we gave the district court guidance for how to apply that rule on remand. We cautioned that parents knowing about the school district's assessments did "not necessarily mean they 'knew or had reason to know' of the basis of their claims." *Avila*, 852 F.3d at 944. In other words, the first part of our test—the parents' actual or

constructive knowledge of the school district's action—is necessary but not sufficient for the statute of limitations to begin to run, because parents must also know or have reason to know that their child is being denied a FAPE. That explains why *Avila* observed with approval that "[o]ther courts have held that" the knew-or-should-have-known date is "not necessarily when the parents became aware that the district acted or failed to act," but rather "when parents know or have reason to know of an alleged denial of a free appropriate public education under the IDEA." *Id.* (citing *Somoza v. N.Y. City Dep't of Educ.*, 538 F.3d 106, 114 (2d Cir. 2008); *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1288 (11th Cir. 2008)); *see also Somoza*, 538 F.3d at 114 (focusing on the date when "plaintiff's mother knew or should have known about the alleged denials of a FAPE"). *Avila* supports and foreshadowed our two-part interpretation above, which asks when parents know or have reason to believe their child has been denied a FAPE. To be clear, parents need not know the legal intricacies of what qualifies as the denial of a FAPE. What matters is whether parents are reasonably on notice that their child's education is substantially inadequate.

This interpretation of § 1415(f)(3)(C) accounts for the fact that the IDEA's statute of limitations, as a discovery rule, places some onus on parents to act with reasonable diligence. *See, e.g.*, *O'Connor*, 311 F.3d at 1148. The IDEA envisions a process through which parents are active—and, at times, skeptical or adversarial—participants in the formation of their child's IEP. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Parents are on the IEP team, participate in IEP meetings, receive written notice of any changes in services, must consent to all evaluations and services, can request a reevaluation of the student once a

year, may obtain an independent educational evaluation of the child, and can file a complaint regarding basically any disagreement they have with the school district. *See* 20 U.S.C. §§ 1414(a)(1)(D)(i), (a)(2)(A)(ii), (d)(1)(B)(i); 1415(b); *see also Timothy O.*, 822 F.3d at 1112 ("[T]he IDEA contains a significant number of procedural safeguards that are designed to ensure that the child's parents have sufficient information to understand and participate meaningfully in all aspects of th[e] discussion."). Parents are not experts, and any reasonable application of the IDEA's discovery rule must account for this. *See Avila*, 852 F.3d at 944. But by affording parents extensive information and input, the IDEA gives them important tools to advocate for their children, and, with reasonable diligence, raise challenges in a timely manner. As the Third Circuit put it, "although a child's right to special education under the IDEA does not turn on parental vigilance, parental vigilance is vital to the preservation and enforcement of that right." *G.L.*, 802 F.3d at 625 (citation omitted).

At the same time, in assessing whether a claim is timely under the IDEA, the denial of a FAPE is not synonymous with a child simply struggling educationally or behaviorally. Many students who are covered by the IDEA experience regular difficulties in school. Keying the IDEA's discovery rule to the usual difficulties experienced by children with disabilities would be akin to requiring the filing of a lawsuit based on mere suspicion of a claim, which is not the law. *See O'Connor*, 311 F.3d at 1148. The IDEA does not require parents to rush to court any time their child has a bad day at school. Such a rule would be inconsistent with both the general principles underlying a discovery rule and with the collaborative objectives of the IDEA, by which parents,

teachers, and administrators work as a team.  *See Schaffer*, 546 U.S. at 53.

For all of these reasons, for an IDEA misdiagnosis-based claim, the statute of limitations begins to run when parents know or should know about the school district's failure to assess their child for a certain disability, and when the inadequacy of the child's education is sufficiently apparent and persistent to put a reasonably diligent parent on notice that the child is being denied a FAPE.

## B

Applying these principles in this case, we agree with the ALJ that J.R.'s parents knew or should have known about the alleged action that forms the basis of their complaint by the end of 2018, at the latest.  20 U.S.C. § 1415(f)(3)(C).  By that point, J.R.'s parents knew or should have known that (1) VUSD had not assessed J.R. for autism; and (2) J.R. was severely and chronically struggling, both behaviorally and academically, meaning the parents were sufficiently on notice that J.R. was not receiving a FAPE.

Starting with "the alleged action," J.R.'s parents knew or should have known that from 2012 to 2018, VUSD never formally assessed J.R. for autism.  VUSD's proposed assessment plans in 2012, 2015, and 2018 did not include assessments for autism, and J.R.'s parents signed off on those plans.  The 2018 assessment was the first to mention autism, and it concluded J.R. did not meet the eligibility criteria.  If J.R.'s parents disagreed with VUSD's decision not to assess for autism or if they had questions about it, they could have investigated further or raised the issue with VUSD.  But there is no doubt they were aware that no autism assessments had been conducted.

J.R.'s parents also knew or should have known that J.R. was not receiving a FAPE by at least 2018. In his complaint, J.R. alleged that the school district should have suspected J.R. had autism because of his severe behavioral issues. But J.R.'s parents were on notice of his behavioral issues going back to 2012, when he was in kindergarten. VUSD's 2012 Assessment documented "clinically significant" behavior ratings in hyperactivity, attention, and atypicality. J.R.'s teachers noted that he required "constant redirection and clarification of instruction to perform classroom tasks" and was "often engaged in his own activities." Subsequent IEPs in 2013 and 2014 repeated those observations, recording that J.R. spoke loudly, struggled to follow directions, blurted inappropriate words and sounds, exposed his stomach to peers, and regularly disrupted academic instruction. Although later assessments noted some improvement, his 2015 Assessment still scored him in the "clinically significant" range for atypicality. And VUSD's 2018 Assessment described how J.R. "moved his hands back and forth on the table . . . patted his head when trying to think of an answer, and tapped both fingers on the table." Teachers reported that during class, J.R. would sing, talk to himself, and play with supplies. In short, J.R.'s parents were on notice of his persistent behavioral shortcomings, which they assert were the reasons why VUSD should have assessed J.R. for autism.

The same can be said for J.R.'s academic struggles. VUSD's 2012 assessment already placed J.R.'s academic performance in the "lower extreme to below average range." Teachers consistently reported his inability to master basic reading and comprehension skills, and by second grade he required placement in a special classroom for students with learning disabilities. The 2013 IEP likewise reported below-

average cognitive function and severely delayed syntax, morphology, and pragmatic language skills. VUSD's 2015 Assessment similarly concluded that J.R.'s cognitive functioning was "very low for most types of tasks." And in 2018, he continued to score "Well Below Average" in nearly every reading, writing, and math category, with language skills in the first percentile or lower. J.R.'s February 2018 IEP confirmed he was reading at a kindergarten level despite being in sixth grade, and he was unable to identify letters and sounds correctly.

Based on the above facts, we conclude that by the end of 2018, at the very latest, J.R.'s parents knew or should have known that he may not be receiving a FAPE. At that point J.R. was in the sixth grade, but his academic skills were woefully behind, and he was exhibiting many of the same behavioral issues he had demonstrated since kindergarten. Indeed, J.R.'s mother noted in the fall of 2018 that she found it "hard to believe" J.R. was receiving the special education specified by his IEP, "since he has not made progress since the 1st grade" and "has been 'stuck' at the same reading level for the last few years." J.R.'s mother also around this time retained an independent psychologist to conduct a psychoeducational assessment of J.R. And in 2018, when VUSD declined the request for J.R. to receive individualized reading instruction, J.R.'s mother threatened to sue.

We sympathize with J.R.'s parents and can see from the record that they tried to support J.R. in his efforts as a student. But this same record also confirms that J.R.'s parents knew or should have known, by at least 2018, that VUSD's assessments and educational services could be substantially inadequate, yet J.R. waited another three years to file suit. *Cf. Somoza*, 538 F.3d at 114 (noting that the "latest date" when "plaintiff's mother knew or should have

known about the alleged denials of a FAPE" was when the mother "observed her daughter's rapid improvement" in a new program).  Because J.R. did not file his complaint until April 2021, we need not decide whether J.R.'s parents knew or should have known prior to 2018 about the alleged action that forms the basis for the complaint.  Accounting for the fact that J.R.'s parents are not experts, it is sufficient to conclude that J.R.'s parents knew or should have known the basis of the complaint prior to April 2019, given J.R.'s chronic difficulties and notable failure to progress.

## C

J.R. argues, and the district court agreed, that the IDEA's statute of limitations did not begin to run until J.R. was diagnosed with autism in 2021.  In the district court's view, "in order for J.R.'s inadequate education to serve as notice," J.R.'s parents needed to have knowledge that "J.R. suffered from undiagnosed autism."  *J.R.*, 668 F. Supp. 3d at 1072–73.  This reasoning was mistaken.

The problem with J.R.'s proposed approach is that it puts all the focus on the parents' actual knowledge.  But the IDEA's statute of limitations is a discovery rule, which requires courts to determine when parents knew or should have known the relevant facts.  *See* 20 U.S.C. § 1415(f)(3)(C); *Avila*, 852 F.3d at 940.  This means that the statute of limitations is triggered not just when a plaintiff "discovers" her claim, but also when she "reasonably could have discovered" it.  *Avila*, 852 F.3d at 940 (quoting *O'Connor*, 311 F.3d at 1147).  J.R.'s parents surely knew they had a claim against VUSD when he was diagnosed with autism in 2021.  But for the reasons explained above, on the facts presented here, the parents knew or should have known they had a claim under the IDEA by at least late 2018.  The

district court's per se rule that a new diagnosis automatically restarts the clock is incompatible with the IDEA's "knew or should have known" standard.

Nor is it enough to say, as the district court did, that J.R.'s parents are not disability experts. *J.R.*, 668 F. Supp. 3d at 1071. The IDEA's discovery rule should be applied with due regard for the fact that parents are usually not experts, and that is how we applied it above. But the fact that most parents are not experts does not mean the statute of limitations will only begin to run upon a new diagnosis, which would again treat the statute of limitations as an actual knowledge standard.

As we explained above, although parents are not medical experts, parents under the IDEA bear some responsibility for monitoring their children's special education, *see G.L.*, 802 F.3d at 625, as J.R.'s parents generally did here. In addition, "[i]f the parents disagree with the school district's evaluation of their child, they have a right to 'obtain an independent educational evaluation' . . . at public expense." *Timothy O.*, 822 F.3d at 1111 (quoting 20 U.S.C. § 1415(b)(1)); *see also* 34 C.F.R. § 300.502. School districts must notify parents of this right. *See* 20 U.S.C. § 1415(d)(2)(A). If parents choose to exercise this right, the school district must either fund the independent evaluation or file a due process complaint explaining why its own evaluation was appropriate. 34 C.F.R. § 300.502(b)(2). This mechanism is another way the IDEA ensures that parents can make informed assessments about their child's education. And here, J.R.'s parents did obtain independent evaluations.

The Eleventh Circuit's decision in *Draper v. Atlanta Independent School System*, 518 F.3d 1275 (11th Cir. 2008), does not countenance a different result because that case

involved different facts. In *Draper*, the school district's initial 1998 assessment misdiagnosed the student with an intellectual disability and failed to assess him for dyslexia, even though he displayed clear symptoms. *Id.* at 1281. Then, the district failed to conduct the statutorily required triennial reevaluation, leaving the parents with no new information until a second evaluation in 2003 revealed that the original diagnosis was wrong. *Id.* at 1281, 1283, 1288. On those facts, the Eleventh Circuit held that the statute of limitations did not begin to run until the parents learned— through the school district's own reevaluation—that their child had been misdiagnosed. *Id.* at 1288.

*Draper*'s reasoning, which was brief on this point, does not apply here. The school district in *Draper* failed to conduct a required evaluation altogether. *Id.* at 1281, 1283. The court did not identify any facts that otherwise would have put Draper's parents on notice. And the parents sued as soon as the second evaluation revealed that the first one was deficient. Here, by contrast, VUSD conducted multiple timely assessments of J.R. over the years—in 2012, 2015, and 2018—and those evaluations, combined with J.R.'s persistent lack of educational progress, put J.R.'s parents on notice of the basis of their claims. J.R.'s parents did not sue until 2021, nearly a decade after the first assessment. And by late 2018, as we have discussed, J.R.'s parents had themselves commissioned a separate independent evaluation of their own and had threatened to sue the district. There were no analogous circumstances in *Draper*.

Draper "decline[d] . . . to conclude, as a matter of law," that parents of children with special needs "should be blamed for not being experts about learning disabilities." *Id.* at 1288. We fully agree with that sentiment. *Draper* illustrates that a new diagnosis can of course be sufficient to

put parents on notice of their claims. And in certain circumstances, the facts may support the conclusion that the parents were not reasonably on notice prior to that date. But just as *Draper* rejected a per se rule in favor of school districts, it does not support the per se rule that a new diagnosis always restarts the clock, regardless of how much time has passed and the facts that the parents knew or should have known.

In short, by dismissing the facts that should have put J.R.'s parents on notice that his education was chronically inadequate, the district court turned the IDEA's objective discovery rule into a subjective standard. That per se rule would mean that parents could obtain a new diagnosis and then sue for special education dating back years. In this case, J.R. waited until 2021 to challenge allegedly inadequate educational services he received some nine years earlier, when he was in kindergarten. The IDEA's statute of limitations would be seriously undermined if such a suit were allowed to proceed. On this record, J.R.'s parents knew or should have known the basis of their complaint by 2018 at the latest. J.R.'s claims predating April 8, 2019 are therefore time-barred.

## D

We lastly address the two exceptions to the IDEA's statute of limitations. *See* 20 U.S.C. § 1415(f)(3)(D). As an alternative basis for its decision, the district court found that both exceptions applied. *J.R.*, 668 F. Supp. 3d at 1073–75. Considering each exception in turn, we conclude that neither applies.

1

The first exception provides that the limitations period "shall not apply to a parent if the parent was prevented from requesting the [due process] hearing due to . . . specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint." 20 U.S.C. § 1415(f)(3)(D)(i).

The only circuit to have considered this exception in depth is the Third Circuit in *D.K. v. Abington School District*, 696 F.3d 233 (3d Cir. 2012). *D.K.* held that there must be a "high threshold" for § 1415(f)(3)(D)(i) to apply: the "misrepresentation" must be "akin to intent, deceit, or egregious misstatement." *Id.* at 245. The Third Circuit based its interpretation on both the specific language of § 1415(f)(3)(D)(i) and that provision's role in the broader IDEA scheme. Central to the Third Circuit's analysis was the need to distinguish between situations when § 1415(f)(3)(D)(i) applies, on the one hand, and the school district denying a child a FAPE, on the other. For if the latter were always regarded as a "specific misrepresentation" sufficient to trigger § 1415(f)(3)(D)(i), any IDEA violation would automatically toll the limitations period. *Id.* at 245–46. That interpretation, the Third Circuit reasoned, "would allow the exception to become the rule, and the limitations period would be all but eliminated." *Id.* at 246 (quoting *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 775 (M.D. Pa. 2012)).

To police the distinction between the merits of an IDEA claim and a "specific misrepresentation" that removes the statute of limitations bar, the Third Circuit held that for § 1415(f)(3)(D)(i) to apply, "plaintiffs must show that the school intentionally misled them or knowingly deceived

them regarding their child's progress." *Id.* at 246. Under this approach, "[m]ere optimism in reports of a student's progress" does not toll the limitations period. *Id.* at 245. Instead, parents must "at least" show the "school's *knowledge* that its representations of a student's progress or disability [were] untrue or inconsistent with the school's own assessments." *Id.* at 246.

We find the Third Circuit's analysis persuasive and consistent with the text and objective of § 1415(f)(3)(D)(i), and we adopt it. Applying that interpretation, we conclude that § 1415(f)(3)(D)(i) does not apply here. J.R. has not shown that VUSD engaged in "intent, deceit, or egregious misstatement" or that VUSD "intentionally misled" or "knowingly deceived" his parents. *D.K.*, 696 F.3d at 245–46. The district court erred in concluding otherwise.

First, the district court focused on a statement that VUSD included in each of its triennial assessments of J.R.: "Student was assessed in all areas of suspected disability." *J.R.*, 668 F. Supp. 3d at 1073, 1075. This statement is one of several general statements, provided in bullet-point form, that VUSD included in its regular assessments. But this statement does not amount to a "specific misrepresentation" that VUSD had either tested J.R. for autism and found none, or that it did not test him for autism while privately believing that such a test was necessary. No evidence supports either position. The district court erred in treating the district's failure to test for autism, a potential violation of the IDEA, *see Timothy O.*, 822 F.3d at 1119, as sufficient to trigger § 1415(f)(3)(D)(i). *See D.K.*, 696 F.3d at 245–46.

Second, the district court found that VUSD school psychologists made "objectively false and misleading" statements in their triennial assessments of J.R. *J.R.*, 668 F.

Supp. 3d at 1074. In 2012 and 2015, J.R. scored in the "clinically significant" range for atypicality on the Behavioral Assessment System for Children (BASC). And an internal VUSD document titled "2015 BASC Diagnostic Considerations" noted that J.R.'s scores "tend to be relatively high compared with the general population" in categories potentially suggestive of autism (although it made this general statement as to various other disabilities as well). The district court found it significant that, notwithstanding these observations, school psychologists Roxana Llano and Katherine Beley did not mention autism as a possibility to J.R.'s parents. *Id.* at 1074–75. Instead, Llano told J.R.'s parents in 2012 that his scores "suggest a high level of maladjustment and indicate that treatment is necessary." And Beley said in 2015, among other things, that J.R. scores "indicate[] that J.R. sometimes behaves in ways that seem strange." From this the district court concluded that VUSD made specific misrepresentations to J.R.'s parents in 2012 and 2015.

We see it differently. The difficulty we have with the district court's reasoning is that it again collapses the merits of whether VUSD denied J.R. a FAPE by not assessing him for autism with the distinct issue of tolling under § 1415(f)(3)(D)(i). *See D.K.*, 696 F.3d at 245–46. In our view, none of the statements in question from 2012 and 2015 amount to "specific misrepresentations"—reflecting "intent, deceit, or egregious misstatement," *id.* at 245—that VUSD "had resolved the problem forming the basis of the complaint." 20 U.S.C. § 1415(f)(3)(D)(i).

In the ALJ proceedings, Llano testified that she did not suspect autism in 2012 based on a holistic view of J.R.'s behaviors and test scores. Llano stated that J.R. did not "present" as a child with autism because he was "super

friendly," "sought people out all the time," and "enjoy[ed] relating with people very much." Llano categorized his "inappropriate social behaviors" as a lack of maturity often seen in students with attention deficits, placing them "under that umbrella," rather than the "umbrella of autism." Llano further noted that she consulted with a team of people (a resource specialist, a speech pathologist, and an occupational therapist), and none of them—nor J.R.'s parents or teachers—brought up autism as a concern in 2012. And J.R.'s BASC scores merely "validated all of the information that we gathered from interviews and observations related to his inattention."[1]

Beley testified similarly to Llano. Beley explained that she did not suspect autism because she believed J.R.'s symptoms and test scores were more indicative of low cognition, a significant learning disability, and attention deficits. Beley observed that while J.R. was socially immature, he did not display "stereotypical behaviors" of autism. He was "very socially motivated," "had friends," and was "excited to be with adults and gain their attention." While Beley acknowledged that J.R.'s teacher rated him in the "clinically significant" range for atypicality on the BASC, she testified that atypicality is not exclusive to autism. She also explained that the internal "BASC Diagnostic Considerations" document was "computer-

---

[1] The district court also relied on the fact that, ahead of J.R.'s 2012 IEP meeting, one teacher complained to a school administrator that another school administrator had prevented her from presenting J.R.'s parents with the option of enrolling J.R. in a "Special Day Class" to address his deficient language skills. *J.R.*, 668 F. Supp. 3d at 1073 n.21. But this internal VUSD email chain does not constitute a specific misrepresentation to J.R.'s parents, and, in any event, it did not mention autism.

generated," and that she believed her professional experience with the child and the multidisciplinary team's input were "more valid."

To the extent the judgments of these school psychologists were mistaken, VUSD may have violated the IDEA. *See Timothy O.*, 822 F.3d at 1119. And we can accept that if a school district egregiously misdiagnoses or fails to diagnose a student's disability, a parent may well be able to point to statements by the school district that could qualify as "specific misrepresentations." *Cf. Draper*, 518 F.3d at 1288 (holding that parents' claim was timely where "[t]he persistent refusal of the School System to acknowledge the substantial evidence of its misdiagnosis borders on incredible"). But that is not this case. The statements the psychologists made to J.R.'s parents did not rise to the "high threshold" of a "specific misrepresentation," as there is no basis to conclude that VUSD "intentionally misled [J.R.'s parents] or knowingly deceived them regarding their child's progress." *D.K.*, 696 F.3d at 245–46. Indeed, the 2012 and 2015 communications conveyed the opposite, namely, that J.R. continued to struggle in significant ways, both behaviorally and academically. Nor, as J.R. suggests, did the internal 2015 "BASC Diagnostics Considerations" report conclude that J.R. likely had autism.

These same points address the district court's concerns with statements in J.R.'s 2018 assessment, which was prepared by school psychologist Jana Woodruff. In her 2018 report, Woodruff concluded that J.R. "does not appear to meet eligibility criteria for Autism." She based this opinion "on parent reports, school records, observations and current testing," noting that J.R.'s 2018 BASC scores "indicate normal development in the area of pragmatic communication." In explaining her conclusion, Woodruff

observed that J.R. "does not demonstrate unusual responses to sensory experiences."

Woodruff's statements did not contain any "specific misrepresentations" within the meaning of § 1415(f)(3)(D)(i). There is no indication in the record that Woodruff or VUSD believed in 2018 that J.R. had autism or that further testing on that front was necessary. Nor was VUSD's alleged misdiagnosis so lacking in reason or otherwise "incredible." *Draper*, 518 F.3d at 1288; *see D.K.*, 696 F.3d at 247 ("As to subsection (i), neither the School District nor its individual teachers intentionally or knowingly misled Plaintiffs regarding the extent of D.K.'s academic and behavioral issues or the efficacy of the solutions and programs they attempted."). Once again, that VUSD may have denied J.R. a FAPE by not conducting a further assessment in 2018 does not mean that it made "specific misrepresentations . . . that it had resolved the problem forming the basis of the complaint." 20 U.S.C. § 1415(f)(3)(D)(i). J.R.'s evident disagreement with Woodruff's professional judgment does not make her statements "specific misrepresentations."

In any event, even if the 2018 assessment could be said to contain "specific misrepresentations," under § 1415(f)(3)(D)(i) those misrepresentations would only toll the limitations period if they "prevented" the parents "from requesting" a due process hearing. As the Third Circuit explained in *D.K.*, "[e]stablishing evidence of specific misrepresentations . . . is insufficient to invoke the exceptions; a plaintiff must also show that the misrepresentations or withholding *caused* her failure to request a hearing or file a complaint on time." 696 F.3d at 246.

The 2018 assessment played no such causal role here. Just a few months after receiving Woodruff's 2018 report, J.R.'s parents retained a private psychologist to assess J.R. And J.R.'s mother threatened legal action shortly after that, in October 2018. There is no basis to conclude that the reason J.R.'s parents decided not to sue was because of Woodruff's statement six months earlier.

*Third*, and finally, J.R. points to optimistic statements that his teachers made to his parents, for example, that he was making "great progress" in some areas. J.R. argues that these statements understated his struggles and made his parents think that his IEP plan was working, when it was not. We agree with the Third Circuit, however, that if "[m]ere optimism" from teachers qualified as specific misrepresentations, the exception would swallow the rule. *D.K.*, 696 F.3d at 245. Each of the statements J.R. identifies is about a specific assignment or area in which an individual teacher observed J.R. making some progress—not a "specific misrepresentation" that VUSD had "resolved" the problem that is the basis of this lawsuit.

2

The second exception to the IDEA's statute of limitations applies "if the parent was prevented from requesting the hearing due to . . . the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." 20 U.S.C. § 1415(f)(3)(D)(ii). As the Third Circuit observed, the statutory text "plainly indicates that only the failure to supply *statutorily mandated* disclosures can toll the statute of limitations." *D.K.*, 696 F.3d at 246. That is, "plaintiffs can satisfy this exception only by showing that the school failed to provide them with a written notice,

explanation, or form specifically required by the IDEA statutes and regulations." *Id.*

This exception does not apply in this case because J.R. fails to identify any statutorily mandated disclosures that VUSD withheld. The IDEA explicitly requires that school districts provide certain information to parents. *See, e.g.*, 20 U.S.C. § 1414(b)(1) (notice of proposed evaluation procedures); § 1415(d)(1)(A) (notice of procedural safeguards); § 1415(b)(3) (notice of change in identification, evaluation, or placement of the child). But neither J.R. nor the district court tie their justifications for this exception to any disclosure provision in the IDEA. VUSD pointed this problem out below, and the district court acknowledged that VUSD "may be correct." *J.R.*, 668 F. Supp. 3d at 1073. But the district court went on to find that the exception applied anyway, for largely the same reasons as the first exception. Because J.R. has not identified any statutorily mandated disclosures that VUSD withheld, we conclude the tolling exception in § 1415(f)(3)(D)(ii) does not apply.

IV

In sum, we hold that the IDEA's two-year statute of limitations bars J.R.'s claims predating April 8, 2019. We therefore reverse the district court's contrary decision awarding benefits to J.R. for the 2012–2019 period. In light of this conclusion, we also vacate the district court's December 23, 2024 remedial order establishing the educational trust and its July 30, 2025 order granting J.R.'s motion to enforce the judgment. Because the pre-2019 claims are time-barred, we do not reach VUSD's additional challenges to the district court's remedial award and directive that VUSD fund a special needs trust. We remand

this case to the district court for any further proceedings as to attorneys' fees.

**REVERSED, VACATED, AND REMANDED.**